On the 21st. day of July 1923, the defendant, an electric contractor, was engaged in building and repairing telephone and telegraph lines, in the state of North Dakota, and on that day he had employed as a foreman for such work, one Ludwig. On cross-examination under the statute, the defendant states: "I started him (meaning Ludwig) out from Hillsboro to drive to McKenzie County, to build some telephone lines. Mr. Sinner, an employee, and my son Benny were with him." "I gave him a map and specific instructions on the route, and I told him where to go. He had never been in this country, and I had." "The car was a ford roadster converted in to sort of a truck with a little box on the back of it." "They had about a thousand pounds in the car besides themselves, tent, cooking utensils, grub, and tools. They left Hillsboro about ten o'clock in the morning." Ludwig, who drove the car, was a witness for the plaintiff and testified that he left Hillsboro ten minutes after ten o'clock in the forenoon. He is asked by the plaintiff if he went by way of New Rockford, and in answering, he said, "We did not get to New Rockford, about a mile or a mile and a half on this side (meaning east of New Rockford) we had *Page 719 
an accident, and the car was burned up." "We had our tent, stove and lots of little things." On cross-examination he states, "I would think we had between eight hundred and a thousand pounds of stuff." He said Mr. Hyland gave him specific instructions as to the route to take. "Mr. Hyland wrote them down on a piece of paper." Q. "And in addition to that he came up to Hillsboro to see you just before you left?" Ans. "Yes Sir." Q. "And at that time he gave specific instructions and pointed out the route on the map, to go west from Hillsboro to Mayville?" To this question plaintiff objects on the ground that it is not proper cross-examination, and the over-ruling of the objection is assigned as error.
Witness had testified that he was working for Hyland on the 21st day of July 1923, and that on that day he left Hillsboro to go out in to the western part of the state to build telephone lines. He is then asked if he went by way of New Rockford. He answers, "We didn't get to New Rockford." Q. "How far did you go with the car?" Ans. "About a mile or a mile and a half on this side." Meaning a mile or a mile and a half east of New Rockford. The plaintiff opened up the question of the route taken, and in re-examination of the same witness, he brought out in detail the instructions given to the witness by the defendant on the route to take, and the route which he did take, contrary to the instructions of the defendant. Moreover, the cross-examination was proper.
In the case of Quigley v. Thompson, 211 Pa. 107, 60 A. 506, the defendant was sued for injuries caused by plaintiff being struck by defendant's automobile, and plaintiff called as a witness the chauffeur who was operating the car to show that he was in the employ of the defendant, and on cross-examination he testified that he was operating the machine for his own personal use at the time. The cross-examination was held competent. The court said:
"But an incident of a transaction proved and circumstances connected with it, which qualify or destroy the effect of the testimony in chief, may be brought out in cross-examination. Bank v. Fordyce, 9 Pa. 275, 49 Am. Dec. 561; Jackson v. Litch, 62 Pa. 451; McNeal v. Pittsburg, W.R. Co. 131 Pa. 184, 18 A. 1026; Glenn v. Philadelphia W.C. Traction Co. 206 Pa. 135, 55 A. 860. In the former case it was said by Gibson, Ch. J., `A party is entitled to *Page 720 
bring out any circumstances relating to a fact which an adverse witness is called to prove.' The whole trend of the examination in chief of this witness was to establish facts and circumstances which would make the defendant answerable on the ground that the negligence alleged was that of his servant acting within the scope of his employment. It was competent in cross-examination to develop by the witness the fact, which qualified his testimony, that at the time of the accident he was using the machine in the prosecution of his own business, and not in the business of his employer."
The witness testified that the instructions were, that they were to go from Hillsboro to Mayville, from Mayville to Finley, from Finley to Blabon, Cooperstown and Carrington where they were to tie up for the night. Carrington is about 100 miles due west from Hillsboro. If they left Hillsboro at ten in the morning, it would take them only a little over six hours to go to Carrington at 15 miles an hour. At 20 miles an hour five hours, and in either case they would have been in Carrington long before dark, especially at that time of the year in this latitude. But when they arrived at Finley, on the suggestion of Sinner, they went north and a little west to McVille, to visit Sinner's sister. He says, "I went by way of McVille at the request of Mr. Sinner and for the purpose of permitting him to visit with his sister." "That was the only purpose I had in going to McVille." "It was an entirely different road from the one we were directed to take by Mr. Hyland."
L.J. Kohlman guardian of the plaintiff testified, that he was in New Rockford on the day of the accident, that he and the plaintiff Johnnie Kohlman started home with horse and buggy about nine o'clock in the evening, and that it was dark at that time. There is some question as to the time, but the testimony is positive that it was dark at the time that the accident happened, and that the lights on the car driven by Ludwig were lit. The witness could easily have been mistaken as to the time of night, but not mistaken about whether it was dark or light. He said, "The accident occurred about a mile and a half east of New Rockford." "We saw the car coming a quarter of a mile away, it was being driven from one side to the other, back and forth, zigzagging across the road." The witness testified in his examination in chief, that the car was going from 30 to 35 miles an hour, *Page 721 
but on cross-examination he says from 35 to 40 miles an hour, that he drove over as far as he could on his side of the road and the car ran right into him and on into the ditch on the same side of the road, where it burned up.
The law is well settled that the master is liable for the acts of his servant within the scope of his employment. It is also well settled that if a deviation from instructions are slight that the court may as a matter of law hold the master liable, and if the deviation is unusual the court will hold as a matter of law that the master is not liable, and between the two, that is between the case of slight deviations from instructions, and unusual deviations there may be cases in which the facts and circumstances are such that the jury might infer that the servant was within the scope of his employment.
McVille is the fourth station north and west from Finley, on the Aneta Branch of the Great Northern Railroad. The stations are Finley, Sharon, Aneta, Kloten and McVille. If the stations are seven miles apart it would be at least 28 miles by railroad and considerable farther, by the automobile road on section lines. The prevailing opinion states, "That the deviation was 18 miles north and altogether making the trip approximately 36 miles longer." Conceding the correctness of this statement that Ludwig at the request of Sinner started on a journey from Finley, which took him 18 miles north and 36 miles farther than the prescribed route, so that Sinner might visit his sister at McVille, in what way was the defendant Hyland interested in this visit to Sinner's sister? He did not employ Ludwig to take Sinner to see his sister at McVille, he had no interest in such a visit, and there is no authority that would hold him liable if the accident had occurred on the road from Finley to McVille. He was employed to go to the western part of the state to build telephone lines and according to Ludwig's evidence he was to "Go straight west to Carrington and tie up for the night." He was given a road map and he states that according to the instructions he was to follow the road pointed out by the defendant and was given four days to go from Hillsboro to McKenzie county. That would be about 60 miles a day, but instead of following these instructions he went north and west 36 miles out of the road; and the evidence shows that in the dark of night of that day he was driving on the Tiffany road towards New Rockford at from 35 to 40 miles *Page 722 
an hour backwards and forwards across the road, and if he and Sinner, were not having a "Frolic" or a "Joy ride" of their own what would be necessary for them to do to have a "Frolic" or a "Joy ride" of their own? If that was not an unusual divergence what is an unusual divergence?
Shearman Redfield on Negligence, 6th ed. § 147 states:
"If the servant was, at the time when the injury was inflicted, acting for himself and as his own master pro tempore, the master is not liable. If the servant step aside from the master's business, for however short a time, to do an act not connected with such business the relation of master and servant is for the time suspended. Such is the uniform doctrine laid down by all the authorities. . . . But acts, not amounting to a turning aside completely . . . are often only what might be reasonably anticipated, to which therefore the master's assent may be fairly assumed."
Could the defendant possibly anticipate the action of Ludwig and Sinner in going 36 miles out of the road and in zigzagging across the Tiffany road after hours, and in the dark at from 30 to 40 miles an hour? The fact are undisputed and there is no inference that a jury or anyone can draw from the undisputed facts in this case except that Ludwig and Sinner were out on a "Frolic" of their own.
In the case of Gousse v. Lowe, 41 Cal.App. 715, 183 P. 295, the car was kept at the residence of the employer. The chauffeur did not board at the employer's house and got luncheon near a public garage. He was under general instructions to report at the house after luncheon at two o'clock. On the day of the accident the chauffeur did not ask permission to take the car to the public garage, but needing gas he took it there at the noon hour and left it there, while he had his lunch. Returning he purchased gas and filled the tires with air, and it was then his duty to drive the car four or five blocks westwardly to his employer's house. He was having an overcoat altered at the tailor shop two and a half mile east of the garage; he concluded that if he went down town on the street car he could not get back in time to take the motor car to his master's house by two o'clock. He drove to the tailor shop, attending to his business and started westwardly. He picked up a friend and while still a mile east of the garage the accident happened. The court ordered judgment for the defendant and said; `This is not a case of a *Page 723 
mere slight deviation from the line of duty but a departure for the purpose of the servant."
"In a very few cases in other states when the tort occurred on the homeward journey of the disobedient servant the master has been held liable, but the great current of authority, in this country and in England, is against those isolated cases. Danforth v. Fisher, 75 N.H. 111, 21 L.R.A.(N.S.) 93, 139 Am. St. Rep. 670,71 A. 535; Colwell v. Ætna Bottle Stopper Co. 33 R.I. 531,82 A. 388, 2 N.C.C.A. 430; Reynolds v. Buck, 127 Iowa, 601, 103 N.W. 946, 18 Am. Neg. Rep. 412; Riley v. Roach, 168 Mich. 294, 37 L.R.A.(N.S.) 834, 134 N.W. 14; Ludberg v. Barghoorn, 73 Wn. 476, 131 P. 1165; Chicago, St. P.M. O.R. Co. v. Bryant, 13 C.C.A. 249, 27 U.S. App. 681, 65 Fed. 969; St. Louis Southwestern R. Co. v. Harvey, 75 C.C.A. 536, 144 Fed. 806; Hartnett v. Gryzmish, 218 Mass. 258, 105 N.E. 988; Solomon v. Commonwealth Trust Co. 256 Pa. 55, 100 A. 534; Mitchell v. Crassweller, 13 C.B. 237, 138 Eng. Reprint, 1189, 17 Eng. Rul. Cas. 252; Storey v. Ashton L.R. 4 Q.B. 476. They cannot be supported upon any sound reason. If the servant takes his master's machine for a junketing or a business trip of his own, the trip is not complete when he reaches a point miles away from the place where the machine ought to be. The servant is upon his own trip until his return to the point of departure, or to a point where in the performance of his duty he should be."
In a very recent Missouri case, Anderson v. Nagel, 214 Mo. App. 134, 259 S.W. 858, the defendant sent his son, who was his chauffeur, to a neighbor to borrow a hay rake, and directed him to come back to dinner. The young man who was eighteen years of age went to the neighbor's house, and being told that he might have the loan of the rake, drove towards St. Charles about a mile to see about a ball game. There were some cars at the house where he intended to stop, and concluding that they had company he did not stop. He drove up the road three quarters of a mile farther, turned around, and on the road home the accident happened. The court said:
"The defendant's son, when he had turned about and started upon his homeward journey, had not then completed the trip upon which he had embarked for his own purposes. He had not then returned, he was but returning, to his employment. He was upon his own trip until *Page 724 
he had returned to the point of departure from the path of duty, or to a point where, in the performance of his duty, he was required to be. This view is supported by practically all the authorities, and is not out of accord with the decisions of the courts of this state. Gousse v. Lowe, 41 Cal.App. 715, loc. cit. 719, 183 P. 295; Cannon v. Goodyear Tire Rubber Co. 60 Utah, 346, 208 P. 519, loc. cit. 521; Hartnett v. Gryzmish,218 Mass. 258, 105 N.E. 988; Solomon v. Commonwealth Trust Co. 256 Pa. 55, 100 A. 534; Mitchell v. Crassweller, 13 C.B. 237, 138 Eng. Reprint, 1189, 17 Eng. Rul. Cas. 252; Danforth v. Fisher, supra; Colwell v. Ætna Bottle Stopper Co. 33 R.I. 531, 82 A. 388, 2 N.C.C.A. 430; Reynolds v. Buck, 127 Iowa, 601, 103 N.W. 946, 18 Am. Neg. Rep. 412; Riley v. Roach, 168 Mich. 294, 37 L.R.A.(N.S.) 834, 134 N.W. 14; Ludberg v. Barghoorn, 73 Wn. 476, 131 P. 1165; St. Louis Southwestern R. Co. v. Harvey, 75 C.C.A. 536, 144 Fed. 806; Rose v. Balfe, 223 N.Y. 481, 119 N.E. 842, Ann. Cas. 1918D, 238, 17 N.C.C.A. 721; Fleischner v. Durgin, 207 Mass. 435, 33 L.R.A.(N.S.) 79, 93 N.E. 801, 20 Ann. Cas. 1291; Reilly v. Connable, 214 N.Y. 586, L.R.A. 1916A, 954, 108 N.E. 853, Ann. Cas. 1916A, 656."
In the case of Prova v. Conrad, 130 Minn. 412, 153 N.W. 753, the chauffeur only had authority to use the car in his employer's business. On the day of the injury the chauffeur had taken the defendant to his home and was then directed to go to his own home, and after supper to return to the defendant's residence and take the defendant and other members of his family to the theatre. The chauffeur drove past his residence and some eight or ten blocks beyond on a mission of his own to inform a friend that he could not keep an engagment with him that evening. He was some eight blocks beyond his own home when the accident happened.
The court said: "So the primary inquiry and the test of liability centers around the question whether at the time complained of the servant was pursuing his master's work." This rule has been applied in automobile cases heretofore presented." "Slater v. Advance Thresher Co. 97 Minn. 305, 5 L.R.A.(N.S.) 598, 107 N.W. 133; Ploetz v. Holt, 124 Minn. 169, 144 N.W. 745; Kayser v. Van Nest, 125 Minn. 277, 51 L.R.A.(N.S.) 598, 146 N.W. 1091; Geiss v. Twin City Taxicab Co. 120 Minn. 368, 45 L.R.A.(N.S.) 382, *Page 725 
139 N.W. 611." The plaintiffs claim that the question of whether the chauffeur was acting in the scope of his authority was for the jury, and the court said: It is clear from the facts stated that the chauffeur was engaged in furthering his own interest contrary to the directions of the defendant. This view of the case is supported by numerous recent opinions of other courts which are cited.
In the case of Hill v. Staats, a Texas case, ___ Tex. Civ. App. ___, 187 S.W. 1039, the chauffeur was directed to bring the master's wife and children to a circus, and to remain on the show grounds until the show was out, when he was to bring the wife and children home. He disobeyed the orders, and when returning there was an accident, and the court held, that the master was not liable. A motion was made for a rehearing upon the ground that though the chauffeur had disobeyed his instructions in leaving the show grounds, yet, since the master had enjoined him not to leave the car during the time the master's wife and children were attending the circus, but to remain in charge of the car, and since the accident occurred while the chauffeur was apparently returning to the place where he had been ordered to remain, it should be held that the chauffeur was resuming the service of his master, at the time of the injury, and was therefore acting within the scope of his employment. But the court in an additional opinion, Hill v. Staats, ___ Tex. Civ. App. ___, 189 S.W. 85, following decisions already quoted, held that although the chauffeur was apparently returning that he was not acting in the scope of his employment.
In Riley v. Roach, 168 Mich. 294, 37 L.R.A.(N.S.) 834, 134 N.W. 14, the court held, that the owner of an automobile who, upon leaving home, instructs his chauffeur not to take the machine out without his orders from himself or wife is not liable for injuries done by the machine while it is being used by the chauffeur contrary to express orders.
In Slater v. Advance Thresher Co. supra, the court said, "There is no controversy about the facts and the court erred in submitting the case to the jury. Whether the agent was acting in the scope of his employment was under the evidence a question of law."
In Brinkman v. Zukerman, 192 Mich. 624, 159 N.W. 316, the chauffeur brought the master to a certain place and was directed to return for him at twelve o'clock and it did not appear that any other orders were given to the chauffeur. After leaving the master, the *Page 726 
chauffeur drove to his own residence and from there to his father-in-law's residence where he remained until 15 or 20 minutes before twelve o'clock, and then started back to keep his appointment with his master. The accident happened on the return, and the court said:
It is suggested by counsel that the chauffeur, in returning from his father-in-law's place, must have been acting within the scope of his employment, even if he was not so acting when going out there. And the reason given for the suggestion is that he was returning for the very purpose of keeping his engagement with defendant. But, in fact, no part of the trip, either going or returning, was connected with the defendant's business. It was as much the chauffeur's affair to get back from Dix Avenue as it was to go out there. In both Hartnett v. Gryzmish, 218 Mass. 258, 105 N.E. 988, and Danforth v. Fisher, 75 N.H. 111, 21 L.R.A.(N.S.) 93, 139 Am. St. Rep. 670, 71 A. 535, the chauffeur was returning, when the accident occurred, for the express purpose of performing some duty assigned to him by the owner, yet this was not supposed to affect the owner's liability."
This case is followed in the case of Drobnicki v. Packard Motor Car Co. 212 Mich. 133, 180 N.W. 459.
Danforth v. Fisher, supra, is one of the leading cases. The master told the chauffeur to get his supper and to be at the City Hotel with the automobile at a quarter before seven o'clock. After supper he drove a mile or two to see a friend then started for the hotel. The accident happened on the return trip and while he was enroute to the hotel, and the court held, that the master was not liable.
In the case of Seidl v. Knop, 174 Wis. 397, 182 N.W. 980, the Wisconsin Court held the master not liable for a diversion of the chauffeur, quoting from § 1880, vol. 2, Mechem on Agency, as follows:
"Not every act which an agent or servant may do while he is in the place appointed for the service, or during the time in which he is engaged in the performance, can be deemed to be within the scope of the authority. The test lies deeper than that; it inheres in the relation which the act done bears to the employment. The act cannot be deemed to be within the course of the employment unless upon looking at it, it can be fairly said to be a natural, not disconnected and not extraordinary, part or incident of the service contemplated."
See also O'Brien v. Stern Bros. 223 N.Y. 290, 119 N.E. 550; *Page 727 
Schoenherr v. Hartfield, 172 App. Div. 294, 158 N.Y. Supp. 388; Symington v. Sipes, 121 Md. 313, 47 L.R.A.(N.S.) 662, 88 A. 134; Healey v. Cockrill, 133 Ark. 327, L.R.A. 1918D, 115, 202 S.W. 229; Crady v. Greer, 183 Ky. 675, 210 S.W. 167; Langan v. Nathanson; 161 Minn. 433, 201 N.W. 927. The authorities are all collected, reported, in notes to the case of Fisher v. Fletcher, 22 A.L.R. 1392.
The cases cited and relied upon in the majority opinion are cases of very slight deviation.
In the case of Dennis v. Miller Auto. Co. 73 Cal.App. 293,238 P. 739, the chauffeur drove an express truck delivering packages to the express office. He had no orders as to what route to take. There was a slight diversion of six and one half blocks, at which point the chauffeur turned westwardly and was proceeding directly to the express office when the accident happened.
In the case of Lee v. Pierce, 112 Okla. 212, 239 P. 989, the chauffeur drove the car a little less than four blocks from the course that he was directed to follow. There was no evidence why he did not take the route directed, and nothing to show that the diversion was for his own purpose, or other than going for the defendant.
In the case of Patterson v. Kates (C.C.) 152 Fed. 481, the court held that the master was not liable.
In Appalachian Power Co. v. Robertson, 142 Va. 454, 129 S.E. 224, the court held, that the servant was not acting within the scope of his employment, and since there was no dispute in the evidence it was a question of law for the court, and it was error for the lower court to refuse to grant defendant's motion.
In the case of Jones v. Weigand, 134 App. Div. 644, 119 N.Y. Supp. 441, the driver did not return on the directed route, but went several blocks out of his way. He testified that he took the circuitous route to the stable because he thought it was safer, that by that course he would avoid the traffic and could make it in as good time. It did not occur to him to call on the lady until within a block of her home (the truth of that story was for the jury). That is whether the diversion was to see the lady, or because it was a safer route to take,
In the case of Dalrymple v. Covey Motor Car Co. 66 Or. 533, 48 L.R.A.(N.S.) 424, 135 P. 91, an automobile company sent a chauffeur in its employ to drive a car through the crowded part of the city, *Page 728 
the purchaser being inexperienced, and undertaking to do this as a part of its general business. They stopped at one place to get some automobile supplies that the purchaser had bought, and the court held, that there was evidence to support a verdict against the automobile company. In other words in that case the purchaser was inexperienced and they undertook to see him safely through the crowded streets. No doubt such an arrangement was in the furtherance of the defendant's business. The court says in its opinion, "The evidence was meager and left the matter in doubt to be determined by the jury on the evidence."
In the case of Riordan v. Gas Consumers' Asso. 4 Cal.App. 639,88 P. 809, the servant was feeding a horse furnished by the master, the horse became scared and ran away and the court held, that the feeding of a horse was a part of the servant's duties, and the master was liable.
In the case of Chicago Consol. Bottling Co. v. McGinnis, 86 Ill. App.? 38, there was a conflict in the evidence but it appears therefrom that the driver while engaged in delivering appellant's goods, drove a few blocks out of his route in order to call upon his wife. She was in the territory which he described as his route, that is to say, within the territory in which he delivers the goods of the appellant.
"But, when the use of the car by the driver is entirely
unauthorized, the entire use thereof, both in going and in returning, is not in the furtherance of the master's business, and the owner should not, according to the better authority, be liable for the negligence acts of the chauffeur when on the return trip." Huddy, Auto. 7th ed. p. 819, § 753.
The prevailing opinion quotes from the case of Riley v. Standard Oil Co. 231 N.Y. 301, 22 A.L.R. 1382, 132 N.E. 97, as follows: "It was said that the servant who has deviated from a strict line of duty, does not resume the employment only when he reaches a point on this route which he necessarily would have passed had he obeyed his orders. He may choose a different route." In the Riley case, the chauffeur was not directed to take any route. He was ordered to take the auto truck, drive to the freight yards and get some barrels of paint. After the truck was loaded, the chauffeur picked up some waste pieces of wood, threw them on the truck, and drove four blocks to the house of his sister, where he left the wood, and started then directly towards his master's mill, and the court said: "Considering the short distance and *Page 729 
the little time involved, considering that the truck was loaded with the defendant's goods it is quite possible, a question of fact would be presented, to be decided by the jury." This is a case of slight deviation and since the chauffeur was not directed to take any particular route, he could choose his own route, provided, that it was not such a deviation that would amount to an abandonment. We must keep in mind that the driver of the car in the case at bar was directly east of Carrington when he left Hillsboro, and he was specifically directed to go directly west to Carrington, and when the accident happened at ten o'clock at night, he was a mile and a half east and 18 miles north of Carrington.
In the case of Dockweiler v. American Piano Co. 94 Misc. 712, 160 N.Y. Supp. 270, there were questions of fact which were specially submitted to the jury, and found in favor of the plaintiff, and the court says: "Where the facts are in dispute, or are susceptible of different inferences, the question whether or not the employee was acting in the course and within the scope of his employment is for the jury." A careful reading of this case will show an entirely different state of facts from those in the case at bar. The court further said:
"Where there has been a temporary abandonment, I think the servant cannot ordinarily be said to have returned to his master's service until he has, compatible with his regular or lawful duties, or, at least, reached a point in a zone within which his labors would have been consistent with an act of diviation merely had the original act been such in its other circumstances as to have been one of deviation, and not one of temporary abandonment. This I take it was the actual decision in the Barmore Case, 85 Miss. 426, 70 L.R.A. 627, 38 So. 210, 3 Ann. Cas. 594, and was the principle of the decision in Geraty v. National Ice Co. 16 App. Div. 174, 44 N.Y. Supp. 659, 2 Am. Neg. Rep. 624. It is controlling in the case at bar."
In the case of Eakin v. Anderson, 169 Ky. 1, 183 S.W. 217, Ann. Cas. 1917D, 1003, the court reviews the New York cases. It states that they "Are distinguished from the case at bar by the fact that the deviations were short in comparison with the whole trip and that the rule was not contemplated to, and does not apply, in our judgment, where the trip was undertaken, not in the master's service, but without the knowledge or consent of the master, and for the servant's own purposes; and that the court in the Geraty v. National Ice *Page 730 
Co. Case was of the same opinion is apparent from the following statement made almost immediately following the one last quoted above:
"But if the journey upon which the servant starts be wholly for his own purposes, and without the knowledge or consent of the master, the latter will not be liable."
On the question of the chauffeur disobeying instructions, when told to take the car to the garage (and that is what the instructions to Ludwig to drive straight west to Carrington and tie up for the night amounted to), see Der Ohannessin v. Elliott,233 N.Y. 326, 135 N.E. 518; Bogoard v. Dix (Sup.) 172 N.Y. Supp. 489; Symington v. Sipes, 121 Md. 313, 47 L.R.A.(N.S.) 662, 88 A. 134; Kennedy v. Knott, 264 Pa. 26, 107 A. 390; Savage v. Donovan, 118 Wn. 692, 204 P. 805; Reynolds v. Buck, 127 Iowa, 601, 103 N.W. 946, 18 Am. Neg. Rep. 412.
"Was the function which the servant was discharging at the time when the given tort was committed a function which was within the range of the contract of hiring, or which had been allotted to him after he commenced the performance of the contract? If this question is answered in the negative, the master's nonliability is obviously a necessary inference, even though the act from which the plaintiff's injury resulted was done with a view to benefiting the master. The test with reference to which the right of action in this point of view is determined is, What was the servant employed to do? 6 Labatt, Mast. S. 6851.
In M'Kenzie v. M'Leod, 10 Bing. 385, 131 Eng. Reprint, 953, Alderson, J., made the folowing remarks:
"Now the words, `The servant's duty' may convey several meanings. They may mean cases where the duty is defined by precise orders; or where something is directed to be done, and the manner of doing it is left wholly in the discretion of the servant; or where the manner of doing it is only partly left in his discretion. In the first the act of the servant is the act of the master; in the second, the judgment exercised may be considered the judgment of the master, and the master must be responsible. But where he has neither ordered the thing to be done, nor allowed the servant any discretion as to the mode of doing it, I cannot see how, in common justice or common sense, the master can be held responsible."
The test of the master's liability is whether there was authority expressed *Page 731 
or implied to do the act in question. It must be conceded that there was no express authority in the case at bar authorizing Ludwig to go to McVille to see Sinner's sister, and how could there be implied authority in the face of the positive instructions to go directly west to Carrington and tie up for the night. The instructions left no discretion in Ludwig, and he had no express or implied authority to use defendant's automobile in the trip to McVille, either going or returning, it was no part of the journey to McKenzie county.
There are cases when the chauffeur has discretion, as where no instructions are given, or even when instructions are given, but it becomes necessary to make a detour. The road may be closed for repair or it may be safer to go on a certain street in a large city to avoid the traffic, or any emergency in which the servant can justify his action to his master. In what way could Ludwig justify the going to McVille to see Sinner's sister? Could he collect pay for extra time employed on the trip? Certainly not, Why not? Because it was no part of his journey. He did not go to McVille for the defendant, the relation of master and servant had ceased to exist between Ludwig and the defendant. Ludwig had become the servant of Sinner, and Ludwig and Sinner are alone responsible, not only to the plaintiff, but to the defendant for the destruction of the automobile.
In the case at bar, Ludwig was not a regular chauffeur. He was employed as a foreman to build telephone lines in McKenzie County. The defendant took great care in directing him where to go and how to go. He made an extra trip to Hillsboro on the morning of Ludwig's departure from that town, and again gave him specific instructions on the route that he was to take. Ludwig had never been over the road, and the defendant furnished him with a road map, pointing out the road on the map. According to the instructions Ludwig was to go directly west to Carrington and stay there over night; that was his day's work that day. He was not required to travel in the night, or to work over time, but was given a destination he could easily make each day. Instead of obeying his instructions, at the suggestion of Sinner he abandoned his employment and drove 18 miles north in the wrong direction, and 36 miles south of the way, not for the defendant, but to give Sinner an opportunity to visit his sister.
There is no conflict in the evidence and no inference can be drawn *Page 732 
except that at the request of Sinner, Ludwig abandoned his employment, went to McVille, and made such an unusual diversion, that the trial court was justified in granting defendant's motion for a directed verdict, and the judgment should be affirmed.